UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 2:18-CR-272 |
| | § | |
| ALBERTO CASTELLANO-ACOSTA | § | |

### ORDER ON MOTION TO SUPPRESS

Before the Court is Defendant Alberto Castellano-Acosta's motion to suppress evidence (D.E. 20). Castellano-Acosta is charged by indictment (D.E. 13) with two counts of attempted transportation of aliens in violation of law. For the following reasons, the motion is **DENIED**.

### FACTS

Around 9 p.m. on March 15, 2018, Castellano-Acosta was driving a tractor-trailer eastbound on Highway 59 toward Beeville, Texas. A few miles from Beeville, Castellano-Acosta passed Sergeant Rick Villareal and Deputy John Billman of the Bee County Sheriff's Office, who were parked on the opposite side of the road finishing a traffic stop. At least the rear lights of the officers' squad car were activated, and Castellano-Acosta slowed as he passed the officers.

After finishing their stop, the officers turned around to return to Beeville. Now behind Castellano-Acosta, they noticed he was traveling approximately 40 miles per hour in an area with a speed limit of 75 miles per hour. The officers' squad car was the third car backed up behind Castellano-Acosta, and several cars were backed up behind the officers as well.

The officers decided to pull Castellano-Acosta over for obstructing traffic and activated their overhead lights. Castellano-Acosta pulled to the side of the road and stepped down from the truck. The officers began to question him regarding his cargo and destination. The officers were particularly interested in the rear of Castellano-Acosta's trailer, which had an ordinary padlock on it, rather than the type of seal normally used by truckers hauling cargo. Castellano-Acosta said he didn't have the key to the lock, a fact the officers found suspicious.

Approximately nine minutes into the stop, Castellano-Acosta agreed to allow a search of his truck. That search revealed two individuals, later determined to be present in the United States without legal authorization, hiding in the cab of the truck. Castellano-Acosta has moved to suppress the fruits of his seizure.

## ANALYSIS

### A. The Traffic Stop

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. CONST. amend. IV. Traffic stops are considered seizures for purposes of the Fourth Amendment. *See United States v. Valadez*, 267 F.3d 395, 397 (5th Cir. 2001). The legality of a traffic stop is analyzed under the "reasonable suspicion" framework articulated in *Terry v. Ohio*, 392 U.S. 1 (1968). *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). Under the two-part reasonable suspicion inquiry, the Court asks whether the stop was: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances that justified" the seizure. *Valadez*, 267 F.3d at 398.

### 1. Justification for the Stop

For a vehicular stop to be justified at its inception, "an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). "Reasonable suspicion requires more than a mere unparticularized hunch, but considerably less than proof by a preponderance of the evidence." *United States v. Ceniceros*, 204 F.3d 581, 584 (5th Cir. 2000).

As justification for the stop, the government points to § 545.363 of the Texas Transportation Code. That provision states that a driver "may not drive so slowly as to impede the normal and reasonable movement of traffic, except when reduced speed is necessary for safe operation or in compliance with law." Tex. Transp. Code Ann. § 545.363(a). The statute criminalizes impeding traffic, not driving at a slow speed, so the fact that Castellano-Acosta was traveling below the speed limit does not constitute per se justification for the stop. *See Delafuente v. State*, 414 S.W.3d 173, 178 (Tex. 2013) ("Driving at a speed that is less than the posted limit is not, by itself, sufficient for reasonable suspicion; a violation occurs only when the normal and reasonable movement of traffic is impeded.").

The Court agrees that the officers reasonably suspected that Castellano-Acosta was violating this provision and therefore they could constitutionally stop him. The record indicates that the officers followed Castellano-Acosta for approximately two minutes at a speed well below the posted limit before pulling him over. Dash cam video from the officers' squad car shows four cars passing the squad car immediately after it

stopped behind Castellano-Acosta's tractor-trailer, so it does appear that a line of cars built up behind Castellano-Acosta before the officers pulled him over. The Court notes as well that the stretch of Highway 59 where the officers stopped Castellano-Acosta accommodates only one lane of traffic in either direction, with the road marked to allow only intermittent passing opportunities. Even light westbound traffic, then, would have greatly impaired anyone's ability to pass Castellano-Acosta. It was therefore reasonable for the officers to suspect that Castellano-Acosta was impeding traffic in a manner prohibited by Texas law.

Castellano-Acosta offers several reasons why any similarly situated motorist might have been traveling at a comparable speed. For instance, he argues that Texas law required him to slow to at least 20 miles under the speed limit when he passed the squad car on the opposite side of the road with its emergency lights on.[1] He notes as well that there is no posted minimum speed in the area, and that within approximately two miles of where he was stopped, the speed limit drops to 55 and later 40 miles per hour as Highway 59 enters Beeville. Tractor-trailers also take longer than passenger cars to accelerate and decelerate, and it is quite natural to drive more slowly after dark.

Even accounting for these factors, the difference between the posted speed limit and the rate at which Castellano-Acosta was traveling, along with the accumulated backup of cars behind the tractor-trailer, leads the Court to conclude that it was reasonable for the officers to suspect that Castellano-Acosta was violating § 545.363.

---

[1] Tex. Transp. Code § 545.157(b)(2) provides in relevant part that "[o]n approaching [a stationary emergency vehicle using its flashing lights], an operator, unless otherwise directed by a police officer, shall slow to a speed not to exceed 20 miles per hour less than the posted speed limit when the posted speed limit is 25 miles per hour or more."

The stop was therefore justified at its inception.

The authorities that Castellano-Acosta cites do not require a different result. For instance, *United States v. Coronado*, 480 F. Supp. 2d 923 (W.D. Tex. 2007) involved a stop of a motorist traveling "in the left, inside, or fast lane." *Id.* at 926. In finding that the stop lacked reasonable suspicion, the court noted that there was no evidence of "how long [the officer] observed the back up of cars behind the van in the left, inside lane, and whether the van, which was briefly traveling twelve miles under the posted speed limit, was impeding the normal and reasonable movement of traffic." *Id.* at 928. Moreover, "traffic was not so heavy that there were impediments to [the backed-up] vehicles' ability to change lanes and pass the van." *Id.*

Here, Castellano-Acosta was traveling much further below the speed limit than the motorist in *Coronado*—40 miles per hour in a 75 mile-per-hour zone, as compared to 53 miles per hour in a 65 mile-per-hour zone—on a road with fewer passing opportunities than that in *Coronado*. *Coronado* is thus distinguishable. As for Castellano-Acosta's other cited authorities, they all involve speeds closer to the posted limit and/or missing evidence of backed-up traffic.[2] There was sufficient reasonable suspicion to stop Castellano-Acosta's truck.

## 2. Length of Detention

Having determined that the officers had sufficient reasonable suspicion to stop the

---

[2] *See United States v. Ross*, 400 F. Supp. 2d 939, 946 (W.D. Tex. 2005) (35 miles per hour in a 50 mile-per-hour zone); *Thomas v. State*, No. 12-06-00080-CR, 2007 WL 2460073, at *3 (Tex. App.—Tyler Aug. 31, 2007, no pet.) (truck driver did not violate § 545.363 by applying brakes and rapidly slowing from 65 to 50 miles per hour, as there was "no testimony that traffic was backed up or stopped"); *Peters v. Tex. Dep't of Pub. Safety*, 404 S.W.3d 1, 4 n.4 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("[D]riving twenty-five miles per hour below the posted speed limit around 1:40 in the morning on a public road . . . does not constitute a traffic violation, . . . absent evidence that [driver] was impeding the normal and reasonable movement of traffic").

truck, the Court turns next to whether Castellano-Acosta was impermissibly detained.

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (citations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*

Should reasonable suspicion of other criminal activity arise before the ordinary incidents of a traffic stop are completed, however, an officer may continue detaining a motorist for as long as reasonably necessary to confirm or dispel that suspicion. *See United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010). Among the ordinary incidents of a traffic stop are examining drivers' licenses and vehicle registrations and running computer checks. *Id.* An officer may also "ask about the purpose and itinerary of the occupants' trip," or even "ask questions on subjects unrelated to the circumstances that caused the stop, so long as these unrelated questions do not extend the duration of the stop." *Id.*; *see also United States v. Alfaro*, 638 F. App'x 374, 375 (5th Cir.), *cert. denied*, 136 S. Ct. 2530 (2016). The Fifth Circuit has never required officers conducting a traffic stop to follow any prescribed script, as "detention, not questioning, is the evil at which *Terry*'s second prong is aimed." *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993); *see also United States v. Machuca-Barrera*, 261 F.3d 425, 432 (5th Cir. 2001) ("[T]he Fourth Amendment prohibits only unreasonable seizures, not unreasonable questions.").

At the hearing on Castellano-Acosta's motion, the government introduced a video

recording of the stop as captured by a body camera worn by Sergeant Villareal. The video shows that Castellano-Acosta obeyed Sergeant Villareal's command to exit the cab and began speaking with him in Spanish. When asked why he was driving so slowly, Castellano-Acosta said that he had slowed down because he had seen the officers' lights. Castellano-Acosta appeared somewhat agitated during the initial phase of the encounter, although the video suggests other factors—particularly, the fact that the conversation took place on a narrow shoulder over background noise from passing traffic—that might have contributed to Castellano-Acosta's demeanor.

The officers led Castellano-Acosta to the back of the trailer, where there was less noise coming from the highway and he appeared calmer. Castellano-Acosta explained that he was returning to Houston after having dropped off a load of water in Edinburg. He said that the trailer was empty, a fact that struck the officers as peculiar because in their experience, most truckers traveling eastbound on Highway 59 are carrying cargo.[3] He also answered that the lock was always on the trailer, but that he did not have a key to it because he had lost it. This similarly heightened the officers' suspicions. Castellano-Acosta was compliant with the officers' questions, and he provided them a number of documents for inspection.

Approximately nine minutes into the stop, Castellano-Acosta agreed to permit a search of the truck. Still focusing on the trailer, the officers asked Castellano-Acosta who they could ask for permission to cut the lock off the trailer to check inside. Castellano-

---

[3] Deputy Billman testified that it was also strange that the trailer was a reefer car, as water is not typically refrigerated during transit.

Acosta answered that he owned his own trucking company, so they did not need any permission beyond his. While one officer was attempting to procure a set of bolt cutters from another unit in the area, the other officer on the scene discovered the people hiding in the cab.

Based upon the totality of the circumstances, the Court holds that the stop was not unconstitutionally prolonged. The record indicates that the officers' suspicion of possible illegal activity began to accrue almost immediately, when they saw a padlock rather than a commercial seal on the trailer—something that Deputy Billman testified as having learned through his training to be on the lookout for.[4] The dash cam video confirms that the padlock was an immediate point of interest, as the recording shows Deputy Billman taking a closer look at the lock even before he approached Castellano-Acosta to discuss the reason for the traffic stop. From there, Castellano-Acosta's nervous demeanor, the fact that his trailer was empty on a route where truckers typically can find cargo to haul, and his having apparently lost the key to the lock, all contributed to the officers' growing suspicion and justified their course of questioning. Of course, there are innocent explanations for each of these factors, and none alone strongly suggests possible criminal activity. But the reasonable suspicion inquiry "'is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion.'" *United States v. Santiago*, 310 F.3d 336, 340 (5th Cir. 2002) (quoting *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999)).

---

[4] Other courts have also credited unusual locks on trailers as contributing to reasonable suspicion. *See, e.g.*, *United States v. Monzon-Gomez*, 244 F. App'x 954 (11th Cir. 2007) (use of a combination lock rather than seal on trailer among factors contributing to reasonable suspicion); *United States v. Willyard*, No. 3:07-CR-44, 2008 WL 400433, at *14 (E.D. Tenn. Feb. 12, 2008).

Castellano-Acosta directs the Court to *United States v. Macias*, 658 F.3d 509 (5th Cir. 2011), which held that an officer unconstitutionally prolonged a traffic stop by asking "numerous questions unrelated to the purpose and itinerary of the stop." *Id.* at 522. *Macias*, however, distinguished between questions "about the purpose and itinerary of [the motorists'] trip" and "questions that were not directed to the itinerary or purpose of [the motorists'] trip." *Id.* at 519. It characterized the former category of questions as "within the scope of investigation attendant to the traffic stop" and thus permissible. *Id.* at 517 (quoting *United States v. Brigham*, 382 F.3d 500, 508 (5th Cir. 2004) (en banc) (internal quotation mark omitted)); *see also id.* at 519 ("Trooper Barragan questioned Macias and Zillioux **extensively** about the purpose and itinerary of their trip. Such questions . . . are permissible because they were related in scope to Trooper Barragan's investigation of the circumstances that caused the stop." (emphasis added)). The latter category of questions, however—which in *Macias*, included questions about the defendant's employment and criminal history—might "impermissibly extend[] the duration of the stop" if the officer does not "'diligently pursue[] a means of investigation that was likely to confirm or dispel [his or her suspicion] quickly.'" *Id.* at 519, 522 (quoting *Brigham*, 382 F.3d at 511).

This case is distinct from *Macias* because the officers' questions to Castellano-Acosta focused on the purpose and itinerary of his trip. His answers, along with their observations, led the officers to develop reasonable suspicion. Castellano-Acosta objects that the officers did not resolve the obstructing-traffic purpose for the stop as quickly as possible, but there is no "per se rule requiring an officer to obtain the driver's license and

registration information and initiate the relevant background checks before asking questions." *Brigham*, 382 F.3d at 511.

Moreover, the *Macias* court noted that the government had "fail[ed] to present any evidence that sets out [the officer conducting the traffic stop's] experience." 658 F.3d at 520. Here, Sergeant Villareal and Deputy Billman respectively have seven and five years of experience with the Bee County Sheriff's Department. The Court credits that their experience caused them to approach this encounter differently from a typical traffic stop. *See Pack*, 612 F.3d at 352 ("[D]ue weight must be given . . . to the specific reasonable inferences which [an officer] is entitled to draw from the facts in light of his experience." (citation and internal quotation marks omitted)). Indeed, Deputy Billman specifically cited how his criminal interdiction training taught him to be on the lookout for trailers with aftermarket padlocks on them.

In sum, the officers' investigative activity was reasonably related to the scope of the stop, and thus the traffic stop was not unlawfully prolonged.

## B. Voluntary Consent

Castellano-Acosta's final challenge under the Fourth Amendment relates to whether he voluntarily consented to the search.[5] "A search conducted pursuant to consent is excepted from the Fourth Amendment's . . . [warrant and probable cause] requirements." *United States v. Perales*, 886 F.3d 542, 545–46 (5th Cir. 2018) (citations

---

[5] Castellano-Acosta's consent analysis assumes that the traffic stop violated the Fourth Amendment, and he submits that his subsequent consent did not "dissipate the taint" of that violation. D.E. 20, p. 6. However, the Court finds no Fourth Amendment violation, so there was no "taint" to dissipate. Therefore, "the government's burden to prove consent by the preponderance of the evidence is not as heavy as it would have been had a Fourth Amendment violation preceded the consent." *United States v. Estrada*, 459 F.3d 627, 633 (5th Cir. 2006).

omitted) (alterations in original). The Fifth Circuit has identified six factors, no one of which is dispositive, for assessing whether consent is voluntarily given:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*Id*. at 546. These factors are assessed in light of the totality of the circumstances, and the government has the burden of proving voluntariness by a preponderance of the evidence. *Id*.

**The voluntariness of the defendant's custodial status.** It is undisputed that Castellano-Acosta was detained under the Fourth Amendment when he consented to the search. He was not placed under arrest or physically restrained, however. If this factor weighs against finding his consent voluntary, it does so only weakly and does not preclude such a finding. *See United States v. Tedford*, 875 F.2d 446, 452 (5th Cir. 1989) (defendant who was handcuffed to a chair voluntarily consented to search).

**The presence of coercive police procedure.** The record does not reflect any police coercion. The officers never drew their weapons, "threatened or yelled at [Castellano-Acosta,] or 'treated him rudely.'" *United States v. Mata*, 517 F.3d 279, 291 (5th Cir. 2008). This factor thus weighs in favor of a finding that Castellano-Acosta's consent was voluntary.

**The extent and level of the defendant's cooperation with the police.** Throughout the interaction, Castellano-Acosta was compliant with the officers, answered

their questions, provided them with various documents, and agreed to let them cut the lock off his trailer. Castellano-Acosta's cooperation thus weighs in favor of a finding that his consent was voluntary. *See United States v. Martinez*, 410 F. App'x 759, 764 (5th Cir. 2011) ("[Defendant's] consent to the search was consistent with the rest of his behavior that night, because at no point did he fail to provide anything but complete cooperation.").

**The defendant's awareness of his right to refuse consent.** There is no evidence that Castellano-Acosta was informed of his right to refuse consent. Nonetheless, "the lack of awareness of this right does not taint the voluntariness of consent." *United States v. Lopez*, 911 F.2d 1006, 1011 (5th Cir. 1990); *see also United States v. Escamilla*, 852 F.3d 474, 483 (5th Cir.) ("[T]here is no '*Miranda* requirement' attending a simple request for permission to search." (citation and quotation marks omitted)), *cert. denied*, 138 S. Ct. 336 (2017). This factor is neutral.

**The defendant's education and intelligence.** There was no evidence presented regarding Castellano-Acosta's education and intelligence, so this factor is neutral.

**The defendant's belief that no incriminating evidence will be found.** The last factor in the voluntariness analysis points to Castellano-Acosta having voluntarily consented. Clearly, the officers were most interested in the trailer, and thus Castellano-Acosta might reasonably have expected them to allow him to continue on his way after it was revealed that the trailer was in fact empty.

In sum, the relevant factors point to the conclusion that Castellano-Acosta's consent was voluntary. As such, there are no grounds to suppress the fruits of the search.

## <u>CONCLUSION</u>

For the foregoing reasons, Castellano-Acosta's motion is **DENIED**.

ORDERED this 13th day of July, 2018.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE